UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BONWORTH, INC., | |
| Plaintiff, | 17 Civ. 9712 (PAE) |
| -v- | OPINION & ORDER |
| RUNWAY 7 FASHIONS, INC., | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

Plaintiff BonWorth, Inc. ("BonWorth"), a clothing retailer, brings this diversity breach of contract action against defendant Runway 7 Fashions, Inc. ("Runway"), a garment wholesaler, alleging that Runway breached a purchasing agreement by failing to timely deliver acceptable and conforming garments. BonWorth brings a single breach of contract claim. Runway counterclaims, alleging that BonWorth accepted Runway's performance and retained the goods delivered to it, and thereafter breached the parties' agreement by refusing to pay for the goods it accepted. It further alleges that, because of BonWorth's alleged breach, Runway was entitled to withhold delivery of other goods and to cancel its agreement with BonWorth.

Pending now are the parties' cross-motions for summary judgment. BonWorth seeks a ruling that Runway is liable to BonWorth for orders that it cancelled. Runway cross-moves, seeking a ruling that BonWorth is liable for goods delivered to, and accepted by, Bonworth; that Runway is entitled to the price of goods it manufactured but did not deliver to BonWorth; and that BonWorth's claims for damages for non-delivery of goods must be dismissed.

Because the parties dispute facts material to BonWorth's claims, the Court denies BonWorth's motion in full. The Court grants Runway's motion only on its claim that BonWorth

is liable for goods delivered to, and conditionally accepted by, BonWorth. It otherwise denies

Runway's motion.

## I. Background[1]

### A. The Parties

---

[1] The Court draws its account of the facts of this case from the parties' submissions in support of and in opposition to the motions for summary judgment, including: the affidavit of Victoria Regensberg in support of Runway's motion ("Regensberg Aff."), Dkt. 44; Runway's Local Rule 56.1 statement ("Runway 56.1"), Dkt. 45; the declaration of Gurusankar Gurumoorthy in support of BonWorth's motion ("Gurumoorthy Decl."), Dkt. 40; BonWorth's revised Local Rule 56.1 statement ("BonWorth 56.1"), Dkt. 41; the declaration of Victoria Regensberg in further support of Runway's motion ("Regensberg Reply Decl."), Dkt. 48; and Runway's response to BonWorth's 56.1 statement ("Runway Reply 56.1"), Dkt. 49.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

To the extent that Runway introduces documentation of BonWorth's tax information that was produced by BonWorth in a separate action, *GACC, LLC v. BonWorth, Inc.*, No. 17 Civ. 2863 (PGG), pursuant to a confidentiality agreement and protective order entered in that case, the Court expressly does not consider such documentation. As the Court unambiguously explained in an earlier order, Dkt. 58, any attempt by Runway to use documents produced in discovery in a separate action pursuant to a confidentiality agreement and protective order is—blatantly—improper. For this reason, the Court does not rely on the declaration of Ahmed A. Massoud, Dkt. 47, which sought to file under seal BonWorth's tax documentation. Likewise, the Court does not rely on BonWorth's response to the Massoud Declaration. Dkt. 59.

Finally, the Court notes that, on October 23, 2018, it ordered the parties, consistent with the Court's individual rules, to file a joint statement of stipulated facts by November 13, 2018. Dkt. 31. On November 9, 2018, the parties filed a joint letter stating that they were unable to agree on *any* facts, and instead of filing even a short joint statement of facts, would be filing respective Rule 56.1 statements only. Dkt. 32. Contrary to the parties' statement in their joint letter, the joint statement of facts was not a "suggest[ion]," Dkt. 32, but in fact was a part of the scheduling order in this case, *see* Dkt. 31.

BonWorth, Inc., is a North Carolina corporation and operates a chain of retail clothing stores throughout the United States. Regensberg Aff. ¶ 4. Runway is a New York corporation that manufactures apparel and other garments for retail stores, including BonWorth. *Id.* ¶ 3. Runway obtained insurance coverage through Coface North America Insurance Co. ("Coface") to insure payment for garments ordered by BonWorth, as required by Runway's lender, Express Trade Capital, Inc. ("Express Trade"). Runway 56.1 ¶ 5.

**B.      The Purchasing Agreement**

On March 7, 2017, BonWorth and Runway entered into a "Purchasing Procedures, Policies and Sourcing Agreement" (the "Purchasing Agreement") to govern the terms under which BonWorth would purchase apparel from Runway. *Id.* ¶ 3. Article 5 of the Purchasing Agreement provides:

> Unless otherwise stated in the Purchase Order, [BonWorth] shall pay the Price of the Goods and the Services within sixty days after receipt by [BonWorth] of a proper invoice with required attachments or, after acceptance of the Goods or Services in question by [BonWorth]. Such payment date shall be extended by one week if the due date falls in the last week of a retail month.

Purchasing Agreement at 5–6.

Article 6 of the Purchasing Agreement governed the process of delivery, acceptance, and BonWorth's right to reject nonconforming goods. Article 6(d) set forth that Bonworth

> may reject any Goods delivered which are not in accordance with the Contract of which [BonWorth], in [BonWorth's] sole discretion, determines are not first quality garments that meet [BonWorth's] Specifications, and shall not be deemed to have accepted any Goods until [BonWorth] has had a reasonable time to inspect them following delivery or, if later, within a reasonable time after any latent defect in the Goods has become apparent.

*Id.* at 6. Further,

> time of delivery of the Goods and of performance of the Services is of the essence of the contract. [Runway] understands that [BonWorth] rejects all late deliveries of Orders as nonconforming. . . . [Runway] agrees that [BonWorth] is relying on

Orders being fulfilled by [Runway] and that no Orders may be cancelled or rejected without [Runway] facing lost sales. The parties agree that 52% of the retail price for Goods is a fair approximation of the damages that [BonWorth] will suffer from a cancelled or rejected Order.

*Id.*

Article 4 of the Purchasing Agreement entitles BonWorth to "non-compliance charges and allowances as chargebacks, offsets or direct payments to [BonWorth], at [BonWorth's] discretion, for [Runway's] failure to follow [various policies] . . . including Schedule A." *Id.* at 5.

Schedule A, attached to the Purchasing Agreement, lists error codes linked to possible delivery issues, and associated minimum and maximum charges that would offset expenses incurred by BonWorth for the errors. Gurumoorthy Decl. Ex. A (Schedule A).

Finally, the Purchasing Agreement provides that North Carolina law governs interpretation of the contracts and related disputes. Purchasing Agreement at 12.

## C.  Purchase Orders

The parties' business relationship was a short-lived one and revolved around several purchase orders ("purchase order" or "POs") and the resulting invoices. Because the facts of each purchase order are relevant to the parties' claims, the Court recounts them in detail below.

On May 30, 2017, BonWorth issued PO 3924 for garments to be delivered by September 25, 2017. Gurumoorthy Decl. ¶ 40 & Ex. P. This order was never delivered, and, as discussed below, the parties dispute whether this order was cancelled by BonWorth or by Runway. Gurumoorthy Decl. ¶ 40; Regensberg Reply Decl. ¶¶ 58–60.

On May 30, 2017, BonWorth also issued PO 3923 for garments to be delivered on October 9, 2017. Regensberg Aff. ¶ 8 & Ex. 2. On October 5, 2017, the garments under PO 3923 were delivered to BonWorth's designated warehouse in Kearny, New Jersey, and Runway

issued Invoice No. 19749 in the amount of $21,000.00 to BonWorth. Regensberg Aff. ¶¶ 10–12. The garments were thereafter delivered to BonWorth's retail locations between October 18, 2017 and October 23, 2017. Gurumoorthy Decl. ¶ 19. On November 24, 2017, a BonWorth representative emailed Victoria Regensberg, Runway's principal, with the error code 812, reflecting "Failure to follow instructions in routing guide," for PO 3923. *Id.* ¶ 20 & Exs. A, E.

On May 31, 2017, BonWorth issued PO 3930 for garments to be delivered by October 15, 2017. Regensberg Aff. ¶ 35 & Ex. 14. On November 10, 2017, the garments under PO 3930 were delivered to the warehouse in Kearny, New Jersey, and Runway issued Invoice No. 19775 in the amount of $31,778.00 to BonWorth. *Id.* ¶¶ 36–38. On November 24, 2017, BonWorth representatives emailed Regensberg with the error codes 510, "Inaccurate packing list"; 600, "Failure to properly pack carton, including empty space in carton"; and 814, "Failure to follow any of the guidelines as described in the manual." Gurumoorthy Decl. ¶ 32 & Exs. A, L.

On June 16, 2017, BonWorth issued POs 3987 and 3988 for garments to be delivered by October 23, 2017. Regensberg Aff. ¶¶ 17, 23 & Exs. 6, 8. On October 30 or 31, 2017, the garments under POs 3987 and 3988 were delivered to the warehouse in Kearny, New Jersey, and Runway issued Invoice No. 19764 in the amount of $31,522.25 and Invoice No. 19765 in the amount of $19,250.00 to BonWorth. *Id.* ¶¶ 18, 21–22, 25–26; Gurumoorthy Decl. ¶ 23. On November 1, 2017, BonWorth emailed to Runway with the error code 611, "Failure to combine between color/P.O.'s (same delivery)," for POs 3987 and 3988. Gurumoorthy Decl. ¶¶ 26–27 & Exs. A, G, H. On November 24, 2017, BonWorth sent emails to Runway with the error code 301, "Late delivery," for both POs. *Id.*

On June 30, 2017, BonWorth issued PO 4108 for garments to be delivered by November 20, 2017. Regensberg Aff. ¶ 39 & Ex. 16. On November 17, 2017, the garments under PO 4108

were delivered to BonWorth's third party warehouse in Kearny, New Jersey and Runway issued Invoice No. 19789 in the amount of $8,802.75 to BonWorth. *Id.* ¶¶ 40–42. On November 24, 2017, BonWorth emailed Runway with the error codes 600, "Failure to properly pack carton, including empty space in carton"; and 812, "Failure to follow instructions outlined in routing guide." Gurumoorthy Decl. ¶ 33 & Exs. A, M.

On July 5, 2017, BonWorth issued PO 4122 for garments to be delivered by November 7, 2017. Regensberg Aff. ¶ 31 & Ex. 12. On November 9, 2017, the garments under PO 4122 were delivered to BonWorth's warehouse in New Jersey, and Runway issued Invoice No. 19770 in the amount of $9,632.25 to BonWorth. *Id.* ¶¶ 32–34. On November 24, 2017, BonWorth emailed Runway with the error codes 301, "Late delivery"; 600, "Failure to properly pack carton, including empty space in carton"; and 812, "Failure to follow instructions outlined in routing guide," for PO 4122. Gurumoorthy Decl. ¶ 31 & Exs. A, K.

On July 17, 2017, BonWorth issued PO 4169 for garments to be delivered by October 23, 2017. Regensberg Aff. ¶ 13 & Ex. 4. On October 20, 2017, the garments under PO 4169 were delivered to BonWorth's warehouse in New Jersey, and Runway issued Invoice No. 19754 in the amount of $13,406.25 to BonWorth. *Id.* ¶¶ 14–16. On November 24, 2017, BonWorth emailed Runway with the error code 510, "Inaccurate packing list." Gurumoorthy Decl. ¶ 22 & Exs. A, F.

On July 17, 2017, BonWorth also issued PO 4170 for garments to be delivered by November 28, 2017. Regensberg Aff. ¶ 43 & Ex. 18. On November 28, 2017, the garments under PO 4169 were delivered to BonWorth's warehouse in New Jersey, and Runway issued Invoice No. 19790 in the amount of $10,257.90 to BonWorth. *Id.* ¶¶ 44–46. On December 2,

2017, BonWorth Vendor Compliance emailed Runway with the error code 510, "Inaccurate packing list." Gurumoorthy Decl. ¶ 34 & Exs. A, N.

On July 21, 2017, BonWorth issued PO 4179 for garments to be delivered by October 23, 2017. Regensberg Aff. ¶ 27 & Ex. 10. On November 1, 2017, the garments under PO 4179 were delivered to BonWorth's third party warehouse, and Runway issued Invoice No. 19766 in the amount of $16,128.00 to BonWorth. *Id.* ¶¶ 28–30. On November 24, 2017, BonWorth emailed Runway with the error codes 600, "Failure to properly pack carton, including empty space in carton," 100, "Unauthorized overage or underage"; 301, "Late delivery"; 510, "Inaccurate packing list; and 814, "Failure to follow any of the guidelines as described in the manual." Gurumoorthy Decl. ¶ 30 & Exs. A, J.

On August 4, 2017, BonWorth issued PO 4189 for garments to be delivered by November 28, 2017. Regensberg Aff. ¶ 47 & Ex. 20. On December 4. 2017, the garments under PO 4189 were delivered to BonWorth's third party warehouse in New Jersey, and Runway issued Invoice No. 19787 in the amount of $9,075.00 to BonWorth. *Id.* ¶¶ 48–50. On December 6, 2017, BonWorth Vendor Compliance emailed Runway with the error code 600, "Failure to properly pack carton, including empty space in carton," and on December 8, 2017, emailed Runway with the error code 301, "Late delivery." Gurumoorthy Decl. ¶ 35 & Exs. A, O.

Between August 16, 2017 and November 13, 2017, BonWorth issued 14 additional purchase orders, numbered 4214, 4216, 4217, 4221, 4353, 4355, 4356, 4357, 4373, 4374, 4416, 4419, 4557, and 4592. Regensberg Aff. ¶¶ 2, 51–63 & Exs. 22–34; Gurumoorthy Decl. ¶ 46 & Ex. R.

### D. Termination of the Business Relationship

On November 28, 2017, Runway received notice from its insurer, Coface, that insurance coverage of BonWorth's garment orders was cancelled due to BonWorth's lack of creditworthiness and history of nonpayment. Regensberg Aff. ¶ 64 & Ex. 35.

On December 8, 2017, Runway sent notice via email to BonWorth that it had failed to make payment for PO 3923, which it alleged was past due, and, that as a result of nonpayment, Runway would not accept further orders nor would it make any further delivery of goods under the outstanding purchase orders that had been placed between August 16, 2017 and November 13, 2017. *Id.* ¶ 72. On the same day, BonWorth replied that payment was not due, and that in any case it had already processed payment for PO 3923. *Id.* ¶ 73.

On December 8, 2017 Runway submitted insurance claims to Coface for the invoices associated with POs 3923, 3930, 3987, 3988, 4108, 4122, 4169, 4170, 4179, and 4189, totaling $170,852.90. *Id.*, Ex. U.

On December 19, 2017, counsel for Runway emailed counsel for BonWorth stating that the goods under POs 4216, 4217, 4221, and 4335 had been released from customs, and requested that payment for these orders be deposited in escrow with either counsel's office as a condition of delivery. *Id.* ¶ 76. On December 22, 2017, counsel for BonWorth replied, rejecting this request. *Id.* ¶ 77. On January 23, 2018, Runway sold to H.A.S. Industries some of the goods ordered by BonWorth under POs 4216, 4217, 4221, and 4355, for $7,463.50. *Id.* ¶ 81.

BonWorth does not appear to have paid Runway for any of the purchase orders at issue.

### E. Procedural History

On December 11, 2017, BonWorth filed this Complaint against Runway. Dkt. 1. On January 10, 2018, Runway submitted an answer and counterclaim against BonWorth. Dkt. 7.

On January 29, 2018, BonWorth filed an answer to Runway's counterclaims. Dkt. 10. On February 13, 2018, the parties appeared before the Court for an initial pre-trial conference.

On October 24, 2018, following discovery, the Court issued a briefing schedule, which included directing the parties to file a Joint Stipulated Facts statement by November 13, 2018. Dkt. 31. On November 9, 2018, the parties filed a joint letter to the Court stating that they were unable to agree on a joint statement of facts, and would instead file only separate 56.1 statements. Dkt. 32.

On December 20, 2018, BonWorth filed a motion for summary judgment. Dkt. 37. On January 4, 2019, it filed its papers in support of its motion, including a Rule 56.1 statement, as well as a memorandum of law and a declaration by Gurusankar Gurumoorthy. Dkts. 39–41. On January 8, 2019, Runway filed a motion for summary judgment, a memorandum of law in support of its summary judgment motion, an affidavit of Victoria Regensberg, and a Rule 56.1 statement. Dkts. 42–45. On January 14, 2019, Runway filed a reply declaration by Victoria Regensberg in opposition to BonWorth's motion for summary judgment as well as a Rule 56.1 statement in reply to BonWorth's Rule 56.1 statement.[2] Dkts. 48–49. On January 18, 2019, Runway filed a memorandum of law in opposition to BonWorth's motion for summary judgment. Dkt. 50. On February 12, 2019, BonWorth filed a memorandum of law in opposition to Runway's motion for summary judgment and in support of BonWorth's motion for summary judgment. Dkt. 57. On February 13, 2019, BonWorth filed a response to Runway's Rule 56.1 statement. Dkt. 59.

---

[2] Runway attempted to file its motion and supporting documents in November 2018, but its filings were deficient in several respects and it was directed to re-file its documents. By the time it did so, BonWorth had already filed its cross-motion. It is for that reason that Runway filed papers both in support of its opening motion and its response to BonWorth's motion around the same time.

On January 30, 2019, Runway filed a letter motion requesting an order to direct the filing, under seal, of copies of BonWorth's tax returns. Dkt. 53. On February 1, 2019, BonWorth filed a letter response in opposition to Runway's letter motion, asking that the Court deny Runway's motion to file the documents under seal. Dkt. 54. On February 4, 2019, Runway submitted a supplemental letter motion requesting that the Court direct the filing of the documents under seal. Dkt. 55. On February 12, 2019, the Court issued an order denying Runway's request to file BonWorth's tax documents under seal. Dkt. 58.

## II.     Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted)).

## III. Discussion

The Court's analysis proceeds as follows. First, the Court addresses BonWorth's claim that it is entitled to summary judgment as to POs 3924 and 4214, which it claims Runway unjustifiably cancelled in October 2017. The Court then considers Runway's counterclaim that it is entitled to payment on goods delivered to, and accepted by, BonWorth, under 10 purchase orders. Finally, the Court addresses the central dispute between the parties: whether Runway was entitled to suspend and cancel various outstanding purchase orders in December 2017.

### A. Purchase Orders 3924 and 4214

BonWorth first argues it is entitled to summary judgment on its claim that Runway is liable for two POs, 3924 and 4214, that Runway cancelled in October 2017. Runway counters that there is a material dispute of fact as to which party was at fault for the non-delivery of goods under these purchase orders.

#### 1. Purchase Order 3924

On May 30, 2017, BonWorth placed PO 3924 for delivery on September 25, 2017. Runway Reply 56.1 ¶ 83. It was valued at $74,200. *Id.* BonWorth asserts that, in October 2017, PO 3924 was wrongfully cancelled by Runway. Because of these failures to deliver goods under

PO 3924, BonWorth argues, Runway breached the Purchasing Agreement and BonWorth is entitled to "52% of the retail price of the goods" in liquidated damages. Purchasing Agreement at 6.

Runway disputes BonWorth's allegations. According to Runway, upon receiving PO 3924, it promptly produced samples of various garments, and BonWorth approved those samples. Regensberg Reply Decl. ¶ 59. Runway then produced the requested lot of goods, based on BonWorth's approval of the initial sample, and forwarded a random final sample of garments to BonWorth for final inspection. *Id.* BonWorth ultimately rejected the final sample, claiming they were of an unacceptable quality. *Id.* However, Runway argues, BonWorth's rejection was wrongful because the lot of goods manufactured under PO 3924 did meet specifications. *Id.* ¶ 60. It identifies an acceptable quality limit ("AQL") report, Regensberg Reply Decl. Ex. 17, prepared by an independent third party, which, it contends, establishes that the final goods to be delivered to BonWorth met BonWorth's specifications.

There exists a genuine dispute of material fact that precludes a grant of summary judgment as to PO 3924. Indeed, BonWorth's own filings reflect a degree of confusion as to which party cancelled the Purchase Order. BonWorth first suggests that Purchase Order 3924 was "cancelled"—though it does not specify by whom—because the goods "did not meet BonWorth's specifications." BonWorth 56.1 ¶ 84. Runway flatly disputes this assertion, pointing to the AQL report that it says reflects that the goods to be delivered under Purchase Order 3924 complied with BonWorth's specifications. But BonWorth also asserts that Runway cancelled the order because Runway could not ship the goods on time and "BonWorth would not accept late [delivery] without applying an error code to assess liquidated damages for being late," and Runway would not absorb such an error code. *Id.* ¶ 87.

A contemporaneous email thread between the parties underscores the dispute between the parties as to who is at fault for cancellation of the Purchase Order. On October 6, 2017, a BonWorth representative emailed Runway noting that "it seems P.o # 3924 [has] not been delivered, which was due Sep 25 – The [error code] may apply for non conf[o]rming goods." Gurumoorthy Decl. Ex. Q. Runway then responded with its understanding that "PO# 3924 was cancelled by the [BonWorth] team." *Id.* BonWorth responded that the order was not cancelled, and that BonWorth had in fact agreed to accept the goods late. *Id.*

This dispute—over who cancelled PO 3924, and whether such cancellation was justified—precludes the Court from granting summary judgment on BonWorth's claim that Runway breached the Purchasing Agreement with respect to that purchase order.

> **2. Purchase Order 4214**

A genuine dispute of material fact as to PO 4214 likewise precludes the Court from granting summary judgment as to BonWorth's claims that Runway wrongfully cancelled Purchase Order 4214. To be sure, the undisputed evidence establishes that Runway *sought* to cancel this Purchase Order. In an October 26, 2017 email, Runway's principal emailed BonWorth asking to "[p]lease cancel this PO that has an 11/28 complete." Gurumoothy Decl. Ex. S. Runway's principal explained that Runway was experiencing problems at its production factories. However, there is evidence that BonWorth rejected Runway's request. In an October 26, 2017 email, BonWorth replied, saying "This PO cannot be cancelled – we have had enough issues already with deliveries." *Id.* The following day, on October 27, 2017, Runway replied "I think we should cancel this style. All other styles that have been placed are in other factories and are on time." *Id.* On that same day, BonWorth replied, "Again- this style cannot be cancelled-

you can produce where you need to – BW needs this PO- as failure to receive this will result in substantial damages during festival season." *Id.*

Runway asserts that, notwithstanding these discussions and Runway's evident factory problems, "the goods ordered under [PO 4214] were in fact manufactured for BonWorth, and passed inspection as established by the AQL 2.5 inspection report . . . ." Regensberg Reply Decl. ¶ 61; *see id.*, Ex. 18 (AQL Report). However, it claims, it ultimately chose to suspend the delivery of goods under PO 4214, not because of difficulties associated with production and delivery of goods, but because, in its view, BonWorth breached the Purchasing Agreement by failing to pay for goods delivered under a separate purchase order.[3]

There is, therefore, a dispute of fact as to whether Runway was entitled to cancel PO 4214. BonWorth argues that Runway wrongfully cancelled the order because it was unable to produce the goods in question, and that argument finds factual support in an email exchange between Runway and BonWorth representatives in October 2017. But Runway offers a plausible contrary explanation: Despite its earlier misgivings reflected in the October 2017 emails, it ultimately produced the goods in question; only later did it cancel the order when BonWorth allegedly breached the Purchasing Agreement by failing to make a required payment. Runway's argument finds support in an AQL report, from which a jury could conclude that Runway ultimately produced the goods at issue and was prepared to deliver them, but for BonWorth's alleged breach. Here, too, a genuine factual dispute precludes an award of summary judgment to BonWorth.

**B.      Goods Under 10 Purchase Orders Delivered to BonWorth**

---

[3] As discussed below, there is a genuine dispute of fact as to whether Runway's blanket suspension of outstanding Purchase Orders—including Order 4214—was justified.

Runway brings a counterclaim that it is entitled to payment for goods allegedly delivered to and accepted by BonWorth without objection, but for which BonWorth has not paid.[4] It seeks judgment in the amount of $171,096.

BonWorth counters that each of the Delivered Purchase Orders was sent late or was otherwise non-conforming. As to each, BonWorth alleges, it generated an error code for errors including late deliveries, failure to follow shipping instructions, inaccurate packing lists, improper packing, incorrect amounts of garments in a shipment, and labeling errors. As BonWorth observes, the Purchasing Agreement provides that it "is entitled to non-compliance charges and allowances as chargebacks, offsets or direct payments to [BonWorth], at [BonWorth's] discretion, for [Runway's] failure to follow Specifications, the Terms, the Worldwide Sourcing Policy, the instructions in the Compliance and Routing Manual, as amended, including Schedule A attached hereto . . . ." Purchasing Agreement at 5. BonWorth argues that, given these error codes, it is entitled to liquidated damages "in an amount to be proven at trial" as to each error code.

Although BonWorth maintains that it is entitled to chargebacks or offsets due to the various error codes it generated in connection with the Delivered Purchase Orders, it does not dispute that it accepted delivery of goods under each Delivered Purchase Order, subject to various error codes. To the contrary, it admits that it "conditionally" accepted the delivery under each. *See* BonWorth 56.1 ¶ 9 (PO 3923); *id.* ¶ 13 (PO 4169); *id.* ¶ 19 (PO 3987); *id.* ¶ 23 (PO 3988); *id.* ¶ 27 (PO 4179); *id.* ¶ 31 (PO 4122); *id.* ¶ 35 (PO 3930); *id.* ¶ 39 (PO 4108); *id.* ¶ 43

---

[4] The purchase orders at issue under this counterclaim are 3923, 4169, 3987, 3988, 4179, 4122, 3930, 4108, 4170, and 4189. Runway 56.1 ¶ 77. Because there is no material dispute that goods under these orders were delivered (albeit late), the Court refers to these purchase orders, collectively, as the "Delivered Purchase Orders."

(PO 4170); *id.* ¶ 47 (PO 4189).  Therefore, there is no dispute that BonWorth is liable to Runway for each of the 10 Delivered Purchase Orders: 3923, 4169, 3987, 3988, 4179, 4122, 3930, 4108, 4170, and 4189.

There is, however, a significant dispute as to the sum that BonWorth owes Runway for these orders.  The parties dispute whether BonWorth is entitled to apply various error codes against the invoices generated in connection with the Delivered Purchase Orders.  If so, it is entitled to offset the damages generated by those error codes against any amount due to Runway for the Delivered Purchase Orders.

The Court, therefore, enters summary judgment in Runway's favor as to the Delivered Purchase Orders as to liability only.  It remains a matter for trial whether the error codes were properly generated, in which case the amount owed by BonWorth to Runway would be offset by the fees associated with each error code, as set forth in Schedule A to the Purchasing Agreement.

### C.     December 2017: The Cancellation of Outstanding Purchase Orders

The heart of the dispute between the parties revolves around Runway's decision, on December 8, 2017, to suspend several outstanding purchase orders.[5]  The parties vigorously contest whether Runway was entitled to cancel those orders.  According to Runway, on December 4, 2017, payment for the first invoice—goods delivered under PO 3923—came due. BonWorth did not make a payment on that purchase order on that date, so, Runway argues, BonWorth breached the Purchasing Agreement; Runway therefore was entitled to suspend and then cancel the remaining purchase orders.  Runway further argues that in an email sent on December 19, 2017, Runway's counsel sought adequate assurances of performance, and

---

[5]  The terminated purchase orders are 4214, 4216, 4217, 4221, 4353, 4355, 4356, 4357, 4373, 4374, 4416, 4419, 4557 and 4592.  Runway 56.1 ¶ 76.

cancelled the outstanding purchase orders only after BonWorth failed to provide such assurances. On that basis, Runway argues that (1) BonWorth's breach of contract claim as to the purchase orders cancelled in December 2017 must fail, and (2) it is entitled to damages for the goods it produced but did not deliver to BonWorth.

BonWorth counters that, under the terms of the Purchasing Agreement, payment for PO 3923 was not due on December 4, 2017, and would not become due until after Runway cancelled the outstanding purchase orders. Alternatively, BonWorth argues, even if payment for goods delivered under PO 3923 were due on December 4, 2017, BonWorth did not owe Runway anything because any such payment would be offset by alleged financial penalties Runway owed BonWorth as compensation for the cancellation of POs 3924 and 4214. Thus, it argues, Runway cannot escape liability for cancelling the outstanding purchase orders.

The Court addresses these arguments below.

### 1. The Date of Payment for Purchase Order 3923

The Court first addresses Runway's argument that the payment for goods delivered under PO 3923 came due on December 4, 2017, and that BonWorth breached the Purchasing Agreement by failing to pay the invoice on that date.

BonWorth, quoting the Purchase Agreement, states that "the Purchasing Agreement provides that BonWorth will pay for goods within sixty days 'after acceptance of the Goods or Services in question by [BonWorth.]'" Dkt. 39 ("BonWorth Mem.") at 13. And, it argues, the earliest date on which BonWorth could have accepted the goods delivered under PO 3923 was October 23, 2017, when it received all the goods. Thus, it contends, payment would have been due, at the earliest, on December 22, 2017—*after* Runway cancelled all the remaining Purchase Orders.

BonWorth's quotation of the payment provision of the Purchasing Agreement contains significant omissions, however. The complete text of Article 5 of the Purchasing Agreement provides:

> *Unless otherwise stated in the Purchase Order*, [BonWorth] shall pay the Price of the Goods and the Services within sixty days *after receipt by [BonWorth] of a proper invoice with required attachments or, after acceptance of the Goods or Services in question by [BonWorth].* Such payment date shall be extended by one week if the due date falls in the last week of a retail month.

Purchasing Agreement at 5–6. Notably, the provision uses the disjunctive "or," which courts "ordinar[ily] presum[e] . . . express[es] an alternative." *Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008); *see also, e.g.*, Black's Law Dictionary 1990 (6th ed. 1990) (noting that "or" is "[a] 'disjunctive' particle used to express an alternative or to give a choice of one among two or more things").

The Purchasing Agreement, therefore, sets forth two default conditions that trigger a payment obligation: the receipt by BonWorth of an invoice or the acceptance of the goods by BonWorth.[6] However, the provision is ambiguous on its face as to whether the 60-day payment deadline is triggered as soon as one condition occurs, or only after the later of the conditions occurs. Put differently, if BonWorth receives an invoice on one date, but does not accept the goods until several weeks later—as BonWorth argues happened in this case—the payment provision does not make clear whether the obligation to pay arises 60 days after BonWorth received the invoice or 60 days after it accepted the goods.

---

[6] The Purchasing Agreement provides that Runway may issue an invoice "on or at any time after delivery of all the Goods or performance of the Services." Purchasing Agreement at 5. It also clarifies that BonWorth shall be deemed to have accepted goods after it "has had a reasonable time to inspect [Goods] following delivery or, if later, within a reasonable time after any latent defect in the Goods has become apparent." *Id.* at 6.

Ultimately, the Court need not resolve the construction of the payment provision. That is because the payment provision provides that the parties may adopt alternative payment arrangements in connection with a Purchase Order. Purchasing Agreement at 5–6 (specifying the default payment options that apply "[u]nless otherwise stated in the Purchase Order"). Runway argues that the parties *did* adopt an alternative payment process with respect to PO 3923. That Purchase Order contains the term "Net 60." Regensberg Aff. Ex. 2. This term, Runway asserts, is an "industry term and a form of trade credit which specifies that the net amount (the total outstanding on an invoice) is to be paid in full by the buyer within 60 days from the date that the goods are delivered to the buyer." Runway 56.1 ¶ 7. And it is undisputed that BonWorth delivered the goods under PO 3923 to BonWorth's designated warehouse on October 5, 2017. Runway 56.1 ¶ 8. Thus, Runway contends, pursuant to the "Net 60" term the parties adopted, payment was due 60 days after delivery, on December 4, 2017—*before* Runway cancelled the outstanding Purchase Orders.

Runway is effectively arguing that, under North Carolina law, which applies here, the term "Net 60" is a "usage of trade" term, meaning that it is a "practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.C. Gen. Stat. Ann. § 25-1-303(c). "The existence and scope of such a usage must be proved as facts." *Id.* Thus, Runway must prove the factual proposition that "Net 60" is, in fact, an industry trade term, and that it means what Runway says it means.

Importantly, BonWorth disputes both those factual assertions. It asserts that the "Net 60" term does not modify the payment provision of the Purchasing Agreement, BonWorth 56.1 at 5–6, and that, even if "Net 60" is accepted as a common industry term, it should be understood to

mean that payment is due 60 days after acceptance (rather than delivery) of the goods, "consistent[] with the terms of the Purchasing Agreement," BonWorth Mem. at 15.

If Runway is correct that "Net 60" is a commonly understood trade term, and that it means payment is due 60 days after delivery (as opposed to acceptance) of goods, then the inclusion of that term on the Purchase Order would modify the default payment terms of the Purchasing Agreement.[7] In turn, payment would be due 60 days after October 5, 2017, *i.e.*, on December 4, 2017. But the existence and scope of "Net 60" as a trade term is, under North Carolina law, a factual proposition that BonWorth disputes.

The parties' disagreement as to the meaning of the term "Net 60" creates a genuine dispute of fact that precludes a determination, at this stage, as to when the payment for goods delivered under Purchase Order 3923 were due.

### 2. Adequate Assurance of Performance

Related to its argument that BonWorth breached the contract on December 4, 2017, when it did not make a payment, Runway argues that BonWorth repudiated the contract on December 22, 2017, when it failed to provide adequate assurance of performance. Under North Carolina law, "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he

---

[7] BonWorth also argues that, if "Net 60" is considered a trade term and carries the meaning that Runway argues it does, it conflicts with the Purchasing Agreement. And, under North Carolina law, BonWorth argues, the language used in the Purchasing Agreement must prevail over a contrary trade term. N.C. Gen. Stat. Ann. § 25-1-303(e)(1) ("Express terms prevail over course of performance, course of dealing, and usage of trade."). This argument is unpersuasive. As stated, the Purchasing Agreement clearly provides that the parties may adopt alternative purchasing terms on a purchase order. Thus, the parties could choose to adopt alternative payment conditions on a PO—as Runway argues they did—without contradicting the express terms of the Purchasing Agreement.

has not already received the agreed return." N.C. Gen. Stat. § 25-2-609(1). The reasonableness of grounds for insecurity "shall be determined according to commercial standards." *Id.* § 25-2-609(2). A failure to provide adequate assurance of performance within 30 days of a justified demand constitutes repudiation of the contract. *Id.* § 25-2-609(4). As courts in this District, interpreting analogous state law, have held, "[w]hether or not the assurances offered were adequate, as per commercial standards and under the circumstances, is a question of fact." *Enron Power Mktg., Inc. v. Nev. Power Co.*, No. 01-16034 (AJG), 2004 WL 2290486, at *6 (S.D.N.Y. Oct. 12, 2004); *see also, e.g.*, *Remuda Jet Five LLC v. EMBRAER-Empressa Brasileira de Aeronautica, S.A.*, No. 10 Civ. 8369 (NRB), 2012 WL 1142296, at *8 (S.D.N.Y. Mar. 27, 2012).

Runway argues that it made its request for reassurance on December 19, 2017, when its counsel sent an email to BonWorth's counsel. That email stated that Runway, "in a good-faith effort to mitigate [its] damages," was offering BonWorth the opportunity to accept delivery of four purchase orders. Regensberg Aff. Ex. 38. Runway stated that "[a]n escrow arrangement is necessary" because of BonWorth's alleged nonpayment. *Id.* On December 22, 2017, BonWorth's counsel responded that "[a]ll invoices have been paid in full per the parties' agreement" and Runway is "now requesting that these goods be purchased by BonWorth under new terms. BonWorth is not willing to enter into any new terms with your client." *Id.*, Ex. 39.

Runway's argument that the December 19, 2017 email sought adequate assurances of performance is belied by the timing of Runway's December 19, 2017 email, as well as the email's plain text. A cursory review of the timeline makes clear that Runway's email purportedly seeking adequate assurance was sent well after both parties had accused the other of breaching the Purchasing Agreement. Indeed, it was sent on December 19, 2017—11 days after

21

Runway had suspended the delivery of outstanding purchase orders, and 8 days after BonWorth filed this very action accusing it of breaching the contract. *See* Dkt. 1 (Complaint filed December 11, 2017). The email's language reinforces the point. Rather than seeking assurances from BonWorth that it will uphold its end of the deal, Runway stated that it will allow BonWorth to accept only a subset of four purchase orders (Purchase Orders 4216, 4217, 4221, and 4335) "in a good-faith effort to mitigate [Runway's] damages." Regensberg Aff. Ex. 38.

Given this language, and the context in which the email was sent, Runway's email cannot be understood as a "clear demand [for assurance] so that all parties are aware that, absent assurances, the demanding party will withhold performance." *In re Pac. Gas & Elec. Co.*, 271 B.R. 626, 642 (N.D. Cal. 2002). Runway's *post hoc* attempt to characterize the December 19, 2017 email as a request for assurance is unpersuasive.

### 3. Payment Offsets

BonWorth offers an alternative argument. It contends that even if payment were due on December 4, 2017 for goods delivered under PO 3923, any such payment was more than offset by liquidated damages owed by Runway to BonWorth in connection with purchase orders that Runway improperly terminated. Specifically, BonWorth argues that POs 3924 and 4241 were cancelled "before either party contends that a payment was possibly owed by BonWorth to Runway." BonWorth Mem. at 12. As to these Purchase Orders, BonWorth claims, it was owed liquidated damages of at least $38,584—more than the $21,000 Runway seeks in connection with Purchase Order 3924. In BonWorth's view, therefore, even if payment was due on December 4, 2017, it did not actually owe Runway anything on that date.

This argument rises and falls with BonWorth's argument that Runway did in fact breach the Purchasing Agreement with respect to POs 3924 and 4241 before December 4, 2019. But, as

the Court has concluded above, there is a genuine dispute of material fact as to those claims. BonWorth cannot, therefore, argue that, as a matter of law, it was owed liquidated damages in connection with those Purchase Orders sufficient to offset any payment due to Runway on December 4, 2017.

## CONCLUSION

For the reasons set forth above, the Court denies BonWorth's motion for summary judgment. The Court grants Runway's motion for summary judgment only as to liability on POs 3923, 4169, 3987, 3988, 4179, 4122, 3930, 4108, 4170, and 4189, and otherwise denies Runway's motion. The amount owed to Runway by BonWorth on those 10 specified purchase orders, if any, is a matter for trial.

The Court directs the parties to file a joint letter on July 23, 2019, setting forth each party's view as to next steps in this litigation. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 37 and 42.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 16, 2019
New York, New York